In addition, we've heard of this court of two of my law clerks, Pamela C. Kelly and Justin B. Rodriguez. And do we have the papers there? No. Right, that's right. Pamela and Justin, if you would come forward. Let's see what the podium... Don't worry, we're not going to ask any questions. She's not going to ask any questions. She will. It is a privilege to have you as clerks this year. I look forward to someday maybe to you being at this podium and we'll turn the bell right off and have fun. We'll just keep going forever. But really, I cannot say enough about how privileged I am to have you with me. And with that, I would move that admission before this court. But as I said, if you want to... No, no, I'll join the majority. I concur as well. I do, too. We agree. Do you solemnly swear or affirm that you would demean yourself as an attorney and counsel at this court, operating in accordance with law, and that you support the Constitution of the United States? I do. Thank you. All right, don't screw this up. We have a few cases this morning. The first case we have is an outspoken speed move-up, a.k.a. who has 11-24-34, Mr. Donahue and Mr. Shapiro or Shapiro? Shapiro, I was talking to you. It's funny, I was talking to Shapiro. So, Shapiro and Donahue, Mr. Donahue. Good morning, Your Honor. Thank you. The court keeps up with their counsels and they avoid that. Will the court please allow me to reserve three minutes of my time? That's fine. Thank you, Your Honor. Your Honor, this case presents the issue of whether and when prejudice about the issue of the extraordinary delight in a supervised police dedication proceeding. The first question, I guess, is who caused the delight? The government caused the delight. Now, didn't your client close some of the, certainly from, you started filing a lot of papers after 9-9, is that correct? He filed a few papers. I would imagine, Your Honor, that the government, for anything, in case number 98587, which is a separate free standing proceeding, in which my client is accused of supposedly extreporizing the issue. I refer that work to a few portions of the appendix that bear that out. First of all, most of the delight in that case was due to the court's reasonable enough determination for purposes of that prosecution to put a sentencing on hold, pending resolution of a credited fallout. And you can look at pages 76 and 77 of the appendix, and specifically docket entries 534 and 615, to see the length of time that contributed. As to the 2255 proceeding that followed the appeals in that case, most of the delight was due to the replacement of the presiding judge and to the length of time, certainly, for me to counsel to file his papers upon. Now, he, first of all, the standard of review here, is plenary, or is it not? No, the standard of review is not plenary. The objection to delay was brought to Judge DuBois' attention in the revocation proceeding. When was it brought to his attention? 2011? At the first opportunity my client had to appear before the court and object to the delay. You could have filed a written objection, couldn't you? Anytime prior to 2011, 2009, and could file it in 2004, 2005, 2006. Well, throughout that period, he was not represented by counsel, and I... Well, he showed you how to file other preside things, didn't he? In a separate proceeding, where he was aware of what was going on. In this proceeding, he hadn't even stepped in front before the court. And what's the prejudice? What's the prejudice? Wasn't he in jail on other charges? Well, we certainly don't know the full extent of the prejudice, Your Honor. We know from Supreme Court precedents, such as Smith v. Huey and Strump v. United States, that even when a defendant is in jail under an undischarged sentence, the uncertain prospect of an additional consecutive sentence will ordinarily be presumed to result in substantial injury. That's one dimension of prejudice. Another dimension is that the delay carried on for so long in this case that the record itself was lost. Another dimension of prejudice is that there was a container lodged against my client, which caused the security classifications to be increased, and therefore may have either led to additional restrictions on his liberty... When you say may, there's no evidence that it actually did result in additional restrictions on his liberty or inability to participate in any programs. There's not even a record about that. And that goes to the broader point, which is that so much time has passed that we don't know and we can't possibly lay our hands on now the full extent of the prejudice. You can't point to any prejudice with respect to the disposition of the charge of the supervised revocation violation. You cannot. I was threatened. In fact, we don't maintain that prejudice consists in that regard. Another dimension of prejudice is the loss of opportunity of my client to develop a case in radiation, what capital words would call a case for life or a life order. Okay, so looking back, you've been able to go that far back, and we often go back further than 99 in a number of cases. What prejudice can you possibly think of that existed with regard to someone who committed a supervised release violation, and if it is determined that he did violate his supervised release conditions, there can be a sentence tacked on to it, that is, a consecutive sentence. I can think of several forms of prejudice, Your Honor. It's a lengthy period of time. In fact, about a year or two. 24 months. 24 months. Okay, I'm sorry. I see what you're saying. The amount of time he was going to add about the 24 months on his case. 12 years have passed before he was heard on the violation charges. The two most obvious types of prejudice that can strike to mind is that once someone's in prison for 12 years, they're going to lose touch with the family and friends from whom the prison isolates them. So the prospects of being able to call upon a free friend or relative who might have been able to come before the court and ask for leniency on his behalf or speak to his popular qualities. First of all, there were drug violations, right? I mean, that had nothing to do with somebody calling a family member. The family member is going to testify, I suppose, to the person's character. But there's no doubt that there were supervised release violations. You're talking about a gun? Yes, I said just that. There's no issue that there were violations. I'm not sure what prejudice was caused there. Is there any evidence in the record that he has family members in the United States? There is. He has family members who were prosecuted by the family prosecutor. So there are going to be ones who call upon past allegations against him. Right. I don't know what the other family members are. I assume he has some family out there. We don't know that. These are interesting arguments that matter about the family. Is that in the record somewhere? There is not any sort of evidence about what family he has in the record, because how much time has passed. Well, we know. He said he was given the opportunity to speak at the time of his sentence, which I'm sure he wasn't. The allegation that he could have put that on the record, but he didn't, did he? Well, I don't know. How did we wind up with the people that come in here and bring up matters that are not in the record? In this case, it is not a water shaft that will open doors in any number of other cases. This case is extraordinary, Your Honor. There's a way carried on for so long in this case to take a measure on it. On the violation of the child, former Governor Elliott Spitzer was virtually unheard of, even on Wall Street. A TV journalist named Britney Spears had just released her debut single. The media was abuzz with the act, and the public so did they. At no point had I ever heard of something called 9-11. The mistake, though, is that the more time that passes, the more evidence that gets lost. So, if the rule is that the sentence is violated, what do you really think that evidence would be that's not available today, that would have been available had the reputation hearing been conducted the same, because I think you really have to exclude 9-11. Now, you tell us, but I'll thank you, Jim, for an important date to look at. I don't think it's quite as simple as we only look back to 2004. We've got four factors. So, the length of the delay takes us all the way back to 1999. Judge McDowell's position, which he joined in the United States, he's bad at explaining, but when you look at the length of the delay, we're not looking at who caused the delay. First, we're just looking at how long the delay was. You talk about presumption. I'm prejudiced. I think it is. It's been quite sad. If it's long, perhaps trying to prove for a particular aspect of this is not essential. You talk about a certain presumption. Right. I think the court really needs to grapple with when it's going to presume prejudice. Is it a rebuttable prejudice? No. That's a very important point. It would not be a rebuttable prejudice. We would always be open to the government to rebut the prejudice. That's an important point. We're not asking for a person to automatically win against us or something like that. We're asking that the defendant not be the one who's always committed to show the prejudice when that kind of time has passed. We know that time... I thought the argument that you were going to make, and you did make it in your brief, is that what happened was it's got so boxed up that, yes, he has a revocation hearing that's postponed in 1999 because there's a low charge. He comes before a judge for only presenting in this other matter in 2004. I thought your argument was that what happened was that his supervised release violation was taken into account by Judge Brody in her unrelated sentencing in 2004. Therefore, he was punished twice. Well, that is the second issue up there. That's an ad argument we're making. But that is a discrete issue from what I think is being... Can we move? Can we move to that? Okay. I'd just like to make a point. No, we're in charge here. Okay, let's move to that. Your time is running out. You're talking about the fact that you say that she took into account that he had violated his supervised release. In what way did she do that? I think you're really talking about two things, aren't you? Number one, you say that it affected the calculation of the criminal history category. Number two, she did make mention when she calculated drug amounts, she said long after he was released from prison, he committed an offense. Is that what you're talking about? Yes. It didn't actually affect his criminal history category. I added two points. Because once you have 13 points, you're in column six regardless, right? Yes. He didn't have a head kick because he was a crude offender, so he was automatically in criminal history category six. The way it plays is that we can tell from the sentencing transcript before Judge Brody that she was quite moved by the extent of her criminal history. And I think that is just for judges to know. But then you have to realize how many criminal history points there were. So although it didn't affect his criminal history category, I think it probably added to the way that she perceived him. Based on my experience in sentencing proceedings, But you'll admit there's nothing in the record to indicate that it did. There's no point that she'd say points. She talked about criminal history, and she did say in the middle of drug calculation she referred to an offense by saying it was the one that was moments after his release from prison. Other than that, there's really nothing in the record, is there? There's also the point that she suggested his criminal history added to it. The pre-sentence report that Judge Brody relied on said that Mr. Bordas would be brought before Judge DuBois considering his supervised release violation. That seems to make your case a lot harder. The core of the second issue is that Judge DuBois stated that Mr. Bordas had been sentenced before Judge Brody as if he were not on supervised release. Those were his words. Not that Judge Brody considered it in some way different from how he was supposed to consider it, but as if she treated him as if he were not being on supervised release. And that is simply factually erroneous. So Judge DuBois needs to express something else with more precision. Mr. Chiu, what can you point in the record to show that Judge Brody punished Mr. Wynok based on a breach of trust relating to the supervised release violation?  And his attorney back then certainly didn't think she had it in mind either, did he? No. And Judge Brody did not say that what he was doing was punishing Mr. Bordas for a breach of trust. It probably just went nowhere in Judge Brody's explanation of that. So that's implicit in the revocation of supervised release. The factors are very similar. The statutory factors, with one or two exceptions, are almost identical whether you're sentencing for a substantive offense or a violation of supervised release. It's like the thing you're supposed to look at. It's one or two minor differences. But the real difference is the breach of trust. Isn't that the difference in the violation of supervised release? Isn't that the real fact of the matter? That is under this court's jurisprudence, which the United States Supreme Court's decision could be unaffirming to some doubts. But my point is that Judge DuBois did not state that he needed to respond with a breach of trust. That's not what Judge Brody said. Well, it's not, but that's implicit, isn't it? I don't think it is implicit when the judge says three times, you've been sentenced before Judge Brody as if you were not on supervised release. If you meant something else, then it's his responsibility to articulate that with greater precision. And he may have the opportunity to. And did he object? Was an objection made to that? No objection was made to his explanation of the sentence as it was not required under Rule 51. Thank you very much. I'm going to get you back under the bottle. Good morning. May it please be clear, my name is Paul Shapiro. I'm a citizen of the United States of China and I represent the United States in this case. You're saying Judge DuBois' observations that Judge Brody sent are statements of the law, more in general. Aren't they really statements of fact? And if they're not statements of fact, aren't they erroneous? They are not. Actually, they are not erroneous. I think they are. One Judge DuBois has explained directly to the defendant as well as the defendant's counsel in several cases of power is that his view, after 20 years of being a district judge and sitting on both trials and revocation proceedings, that the purpose of the proceeding that was before him was, in his words, incremental punishment, which takes us back to the distinction between the two as laid out in the guidelines, the breach of trust, which is a, by the way, legal concept that he's talking about is there are two... But that statement about her not taking it into account, isn't that something that's true? So it's really a little difficult to know what he meant by that, isn't it? I actually think it's not difficult to know what he meant. I think when you read the entire colloquy, he's being not literal in the sense that she was entirely unaware of it. Obviously, she's going to be aware of it. Indeed, it played a part in the trial before Jeff Burry, the fact that he had just been released from prison. That would be an absurd thing for him to be saying. There is a back-and-forth between the judge and the defense counsel about the need for incremental punishment. And that all stems, as the guidelines make it very, very clear, out of the fact that when a supervised release lead commits a new crime, that crime has two aspects. It is a violation of the laws, but it also is a separate and intended breach of trust. And he was getting at that. But as it happened, and I don't know that he was aware of it, he was, as the defense judge has to point out, factually accurate. If he sent a tag-in that says, five years of supervised release, five days of supervised release, so that the supervised release expired before the defendant committed those new crimes, the defendant's sentencing guidelines would have been identical. The defendant's situation towards Jeff Burry would have been identical because he would have been standing in front of her having just been released from prison weeks before. His criminal history would be identical because he was, as this court's published opinion points out, he was a top guideline manager because he was a committed felon. Why did the government not pursue revocation once Mr. Whitehouse began challenging his sentence only and not his conviction? I think the answer to that, Judge, obviously I was not trial counsel, but there's a huge difference between the way supervised release cases are prosecuted and handled, their very existence, and trial matters. The government is responsible for initiating charges in a criminal case. The government is responsible for arresting the defendant in a criminal case. The government is responsible, less so, but still responsible for prosecuting the trial. Are you saying, I mean, Jeff can hear this lengthy answer, that it's not the government's fault, it took 12 years to get this guy to a supervised release revocation hearing, it's the court's fault? I'm not sure that's fault, I won't use the word fault, Your Honor. What I'm saying is that there is a, A was responding to a question, which is, why did the government do not try? And part of the answer to that is, it's a supervised release revocation is, at heart, a very different thing. It is a matter, it is a violation of a court order. It is initiated by an arm of the court. It is, the warrant is issued at the request of an arm of the court. When the matter is heard, yes, the U.S. attorney is there, the U.S. attorney is the prosecutor, but really, the motivating agency is the probation office, which is an arm of the court. And the court has very, very substantial control over how the thing will proceed. So, it's different. Do you concede that there would come a point in time when the delay was so lengthy that it would require the dismissal of the supervised release petition, revocation petition? I would not concede that. And this guy's got about a 25-year sentence, so he's saying he could wait 22 years to get that sentence. The answer is, every year, in the context of supervised release, the process requires a demonstration of prejudice before there's a violation. So, are you asking, is it conceivable that there is a case where, after 22 years, there still would be no prejudice? Yes, it is conceivable. Are you asking me, would it be likely that, after 22 years, you could demonstrate prejudice? Yes. But in every case of this kind, prejudice is an absolute requirement. And in a case such as this, where the violation that is driving this crime is a judgment from the same district court, would there come a point where there would be a presumption of prejudice? There would not. A presumption of prejudice is appropriate in the case of a speedy trial violation, because trials are very, very different animals. So you feel we should not extend that rule? You should not extend it. No court ever has extended it, and this court has suggested, it was not held in a non-presidential opinion, but this court has suggested it. Should we consider, for example, doing what the Seventh Circuit did in the United States v. Rasmussen, which is apply the Margaret v. Rudin of the Sixth Amendment speedy trial right factors to revocation proceedings? We do think you should. Those are the appropriate factors, but as this court has recognized, they mean different things, and they're evaluated in different ways. In Rasmussen, there was only a 13-month delay. Here, there was a 12-year delay. My first question to you was, why don't you do something between, in effect, why don't you do something between 1999 and 2004, when there was a sentence in your court charge of cruelty? And you answered that. Then, after that, there's a seven-year delay. I mean, there's nothing in the record that I can see why. Do you have any inkling as to why this thing just sat for seven years? I do. I do. I had meant to get to it, and I thank you, Your Honor. I understand this is a proceeding that's going before Judge DuBose, who I know, and my office well knows, is very, very cognizant of the defendant's rights at every stage of the proceeding. And what the judge was doing was, A, not an advert, which is clear from the fact that the minute that Judge Davis was done with the 2255, the violation was not scheduled. It's not an adverse procedure, and all the other proceedings before he landed there. Because this is a defendant who is insisting, from the get-go, that she is not guilty of this crime. I agree that she could have gone forward in 2004 without fear of being arrested. But you have a defendant who is absolutely insistent that notwithstanding conviction and appeal, she did not actually do it. And if, in fact, she did not actually do it, it would not have been a violation. And so Judge DuBose chose bending over backwards to give this defendant, who protested his innocence from day one, and if you look at the 2255, ironically, he claimed he did not do the crime. He also claimed, ironically enough, that his trial rights had been violated under the Speedy Trial Act. And he had filed it. Judge DuBose district judges tend to wait on this incident of criminal violation involved in violation of civil residence. Judge DuBose didn't tend to wait until the underlying charges are disposed down in that proceeding. They do tend to wait. And this Court has held in the context of the Speedy Verification Proceeding that to do so is reasonable. I'm not going into the appeals area. It seems to me that the reasonableness of that conduct depends on the position of the defendant and the nature of the violations. Because we often deal with violations of collateral attack or something. I mean, how far up do we go? It seems to me, in this case, that what the judge is doing is he's bending over backwards to give the defendant every opportunity to prove that he is not, in fact, guilty of the crime, he is not, in fact, guilty of the violation. If he was successful in mounting a collateral challenge to the validity of his conviction, that would preclude the district court from proceeding on the civil liability proceeding on the civil liability violation charges. He has a standard to prove that. That's true. It could, and I don't deny that it could have gone forward from the moment that the judge filed. I'm sorry? Are you hedging your bets? Well, we are not hedging anything. I mean, understand, this is not a decision driven by the U.S. Attorney's Office. This is a judge who made, yet it's clear from the record, a conscious decision to afford this defendant every opportunity to disprove. Because the reality is, as long as the conviction stands, there's nothing else to be said from the defense perspective. And the judge could have said to him, look, I'm going to go ahead. You've been convicted. Your appeal has been affirmed. It's 2004. Enough is enough. I'm going to go ahead. Let's look at every violation. If you succeed in mounting a collateral death, you come back and we'll talk about it. That would have been appropriate, but not necessary, and much less protective of the defendant's interest at that time, because that, A, could be on the defendant to come back, and, B, subjects that defendant to any collateral consequences than having a finding of a violation. Whatever kinds of speculative prejudice you can say that there is from having a detainer watch, had the judge found you have violated my order, that would certainly carry into his criminal record and his prison record as well. So you have a judge who could choose either course and have the discretion to do so, and there are cases where it certainly would be prejudicial to proceed the way he did, where the underlying violation is highly fact-bound and witnesses become unavailable or something of that nature. But this is not such a violation, and there was no recidivism. If you look at the colloquy between the defendant and Judge Du Bois, the judge said as much to him in the remark that the defense relies on to get us out of plain error. And you have to go back to that transcript. Tell me, again, why you are saying Judge Du Bois didn't take violation of supervision into account. I'm saying two things, Rick. First, I'm saying that what Judge Du Bois was saying was... I'm not talking about what she said at the time. She said 2004. 2004. Judge Brody did not take into account the fact that he breached Judge Du Bois' trust. That's point number one. Because it's not expressly stated in the records? Because it's not expressly stated in the records, but also because when she talks about his criminal history, she talks about the things that he did, she doesn't say to him, I'm increasing your sentence. Because, look, you violated the trust of this very court. That is a matter that is appropriate. Long after he was released from prison. And that is a history and characteristic of the defendant. But he couldn't have been released from prison without being on supervised release. That doesn't... We're talking about things that are related. I'm not saying that there's no overlap. But that overlap... You've been working a lot on the criminal history chart, has driven this sentence up. I think your prior criminal history... She went on about the... How about that? Imagine my hypothetical, which is that Judge Du Bois ordered five minutes of supervised release upon the conclusion of the prosecution. The defendant loses five minutes without violating it. Then, 15 minutes later, gets involved in a drug violation. Everything that Judge Brody said would have been absolutely identically true, and every part of his criminal history would have been absolutely identically the same. Is that the answer only that she had before PSR that specifically noted that there was a supervised release violation? Not a revocation hearing, coming out that it was to be before Judge Du Bois at some point? Yes, Your Honor. That is very, very easy. Very easy answer. Actually, there are a lot of characteristics of defendants that both judges would have taken into account in the pre-sentence report. Much of the information was the same, I'm sure. There's no Chinese law between these proceedings, but the guidelines make it plain. The underlying concept is one is addressing the violation of law and one is addressing the breach of trust. And though Judge Du Bois may have not used the words breach of trust, that is what he was doing, and appropriately so. Indeed, he was being quite lenient. He felt appropriately that the insult to his lawyer warranted additional punishment, which I concur with that, this would not be. But decided that a short additional punishment was appropriate, notwithstanding what the guidelines otherwise recommended. Thank you very much. Thank you. Mr. Duggan. Mr. Duggan, the first question is, Mr. Spiro has noted that, in effect, what happened here is that the system, whether it was the player of the system, be it the probation office, be it the attorney's office, whatever it might be, be it the judge, they waited until it was crystal clear that there were all avenues to try to deal with the earlier conviction, whatever it was dealt with, and immediately after that, almost immediately after that, then you had the reputation here. Well, with all due respect to my colleague from the attorney's office, I would like to add a phrase from page 39. There, the court says to my client, well, they were liable in front of the conviction, which is a jury verdict. We have that on a keel, and that's fine. And the A.S.A. handled the matter, and the trial court said, Your Honor, if I may, Judge, the director, there was a directed keel taken by Mr. Royak. Judge, your voice's response to that is, it didn't resolve. Judge, Royak was not following the course of proceedings in the independent propagation. That's wrong. Was it the probation office that then asked that it be set up for a revocation hearing at that point, or was it, who made the, who were the catalysts for the revocation hearing in the 11th? The director doesn't judge. We suddenly have a notice from the court that there will be a revocation hearing. I can understand the logical coherence of my colleague's position that it would be, to be honest, a non-probation officer. I would say, since the government's actions are likely consecutive penalties, there's some onus on it, as well. Billy, we will take it either way. The fact is that it's utterly wrong. Utterly and blatantly inconsistent with this record, to state that Judge Du Bois was letting the course of the free standing prosecution wind all the way through the trial proceedings and the propagation hearings, and Judge Du Bois' own words at page 39 of the appendix show that without a doubt, morally, we have an awful shell game going on here. We've got the ASA saying it's the court's responsibility. Here's what the court said at sentencing, after my client said it. There's some kind of limitation on the client. I think the ASA stood up by saying it was the probation office. Okay, the probation office got in the arm of the court. Judge Du Bois, I agree, it's a very conscientious judge. Unfortunately, the case may have split due to compromise. But whether it's the probation office, as far as he's laid back, we're going to make no doubt about it. It's conscientious, right? Absolutely. And so the shell game here appears where Judge Du Bois states, after the court has said, I've been trying to get before you since 2004, Judge Du Bois states, until your conviction, and I'm not even going to do this, after Judge Du Bois has revealed that he wasn't following the course of the prosecution after the ASA explained to him what the course of the prosecution was after that, Judge Du Bois said to my client, until your conviction, you have not violated that provision of supervised release. So you have to be convicted by the jury. Well, once that happens, and he began to file appeals, the government is permitted to delay in having this hearing as they did. So we have the judge putting comments on the government, we have the state government putting comments on the court, with my client staying in prison for seven years asking for the hearing. And the question then comes, let's assume you're right on everything you say. Let's go back to Judge Bantrop's question at the outset. Where's the prejudice? Well, I've done my best to say what prejudice the record shows, but I confess, Your Honor, we have not affirmatively shown prejudice. And the rule has to be, contrary to what my colleague says, that there must come a point in a revocation proceeding when prejudice will be presented. That's because we know that the more time passes, the more evidence disappears. So if the rule were that you must invariably show prejudice, then that would be the longer there's a delay, the less availability of relief. If we had to adopt a simple rule, how far out would you suggest we should go? Should we say it's all right for a district judge to wait until the underlying criminal proceeding is resolved? I mean, you don't want to have two trials, economy, one of those things. Is it all right for him to then wait until the appeal is over? It's going to vary case by case on the Barker v. Wendell factor. In this case, a really critical point is that beginning in 2004, so after judgment was entered, my client started asking to be brought into the hearing. When that's the situation, the judge has to proceed promptly. Well, the only thing you have on that, though, is him saying that the revocation proceeding before Judge DeBruy that he had been at since 2004 and the silence of Judge DeBruy from the government. You don't have any letters. I mean, he would have had to do it in writing. I don't think he'd pick up the phone from prison and call the chambers. Correct. Well, he didn't have any reason to elaborate while he was standing there because people were silent. Now, it might be an appropriate disposition here to remand for a limited hearing as to whether the right was asserted and were confident it will make that trial. We would ask that the remand were acted upon that trial and the condition be dismissed. Judge, we have a remand for Judge Robach, right? Yes. We have a remand for Judge Robach, right? Right. Very quickly, we have a responsibility for Robach. Thank you very much. Thank you very much. Thank you for your testimony. Is this your first time here? No, I don't know. Okay. I didn't know you had a motion that you would have him do it, so I didn't know if it was your first time. Well done. Thank you. Thank you. Thank you. We have a matter of advisement. We'll call the next case. So, taking a shot at the University of Pittsburgh Medical Center, number 11, expert, year 19, Commissioner Saul M. Myers. Good morning, Your Honors. With this court, my name is Charles Stahl, and I represent the Appellant Committee on Substance Abuse Matters. With this court's permission, I would like to reserve five minutes to do that. That's fine. Your Honor, there will be no jury. The following e-mail is to be fired. My client, Jamie, was convicted on January 10th in violation of the interference and retaliation provisions of the Federal Law Act. I'd like to profoundly just pose and answer very briefly three questions. The first question is whether or not the meeting January 3rd that you took was protected under the FMLA. It was because she worked in a hospital in an emergency room. She asked to get some kind of communication on January 3rd that the FMLA might be in play. When she called off, she never mentioned the reason for her mother's hospitalization or the need to care for her after. But the thing that really was troubling here is that, in effect, Ms. Lippenstein came to work the next day, January 4th, worked April shift. She, in effect, had a mulligan, a do-over, and never said a word. I'd like to respond to both of those points. In effect, on January 3rd, she did all that she could. Her mother was taken to the emergency room on that day. She didn't know what the diagnosis was at that time. She didn't know if her mother was going to be admitted to the emergency room. She said she was taken by ambulance. Exactly. So that is sufficient to shift the burden to the employer to resolve any type of ambiguity in that regard as to whether or not it qualifies for FMLA. But on January 4th, she herself had the opportunity all day to resolve the ambiguity. That's a good point, Your Honor. But what I would say in that regard is her supervisor, the one person who hired her, the one that she always went to was Deborah White. Deborah White was not there on that day. Deborah White was on vacation from December 31st to December 2nd. Exactly. Is the adequacy of the notice that was provided on January 4th a question of fact? I would say it's more of a question of want in the sense that whether or not that because there's no issue as to whether or not it was fact. There's no question on that. It's a question of whether or not that was just the, you know, the sufficient ambiguity to shift the burden over to the employer to ask about the nature of it. Again, that's a different kind of question. Ms. White was not there on January 4th. The very first day that Ms. White was there. She came back on the 7th, right? She came back on the 7th. So, let's say if you didn't take advantage of the do-over on the 4th, she could have said something on the 7th, could she not? She was not present there on the 7th. She could have called in. She could have. But she did it on the 8th, right? She did. She called in on the 8th when she was scheduled to go back around 3 a.m. in the morning. That was the very first day that both she and White were both present. She first called in to the next supervisor on the 3rd, yeah? She said, look, I don't know if you know,  and I'm exhausted from taking care of her. I need to take care of her more quickly. Later on that same day, she sent a e-mail to her supervisor on the 2nd. I don't know if that's what she said at the moment. I think she said leave her out. She said leave her out. It's been months since she's been in the hospital. It's been years. It's been years. The fact, though, is before the discharge, which means that as of January 10th, when they told her she was fired, Whitey, who was the position maker, the only one who made the decision, Whitey knew that the discharge, that one of the factors that she was using to fire the listeners, the leave, which was protected under NICA, that notice would apply retroactively to the absence when she pulled in and said there aren't any cases which support that, that it has retroactive effect. I haven't found anything exactly on point, but the point is that she could not use the January 3 discharge as a negative factor when she finally discharges her on January 10th, which is where we met. So we were surprised. Let's give an example. We pulled out on Monday, Tuesday, and Wednesday, and the court said at the end of Wednesday that I'm going to fire her, that Jill will be the primary tomorrow morning. And they make the decision on that day. Before the person makes the new case of discharge, Mary calls up and says, I was caused by a struggle with my wife, and I'd like to ask her if I can leave. Well, the decision was made perhaps beforehand, but at the time of the communication, the employer knew that it was under Whitey's requirement to protect the leave. And so, therefore, I understand the concern the court has about that. That's why I would say that although this was given sufficient time, it was at the very first day that the two of them were both working, but Whitey was on sick, and the employer could not, on January 10th, use that as a negative factor. They couldn't use it because when did Whitey decide to fire or terminate the decision? Well, that's a good question. She says it was before. She says all of it. She says it was December 1st, December 30th. It certainly looks like on December 31st there was some talk about it, and it looks like from what I can see on the record that a final decision was made on the 7th. And my guess is it was going to happen the 8th, except Lippenstein called in on the 8th and said she wasn't going to be there. That's correct, Your Honor. But even if she made the decision on January 7th, once she communicated the decision on January 10th, she knew it was a negative factor. And my position is she cannot use that January 3rd as a reason for the discharge, as a negative factor, and she didn't. Because the EEOC position says before there was any cause for that, there was always a reason why she did that. I thought what they were basing it on was just a host of incidents where Ms. Lippenstein had called off including one time when she was told that she couldn't get time off. And in, I guess it was November, she comes in two and a half hours late and leaves something like two and a half hours early. It's sort of like in spite for not granting her that time off, but that right there would seem to be a firing event. It's not positive, but it's one trigger for a firing event. The one trigger was allegedly December 1st, and that was one of the discharges because they didn't fire her then. And in fact, they sanctioned her for volunteering on December 24th and 25th and working 12 hours. The only meeting that happened after that event was the January 3rd council. And yes, they claim that she did all kinds of terrible things, but the fact of the matter is in the position statement that they gave to the EEOC on the discrimination claim that Ms. Lippenstein talked about, before there was any conclusive discussion on December 30th. Actually, it was December 30th, I believe, that she was told she couldn't take off, came in two and a half hours late, and left almost three hours early at a shift. And then, as I understand it, Leidy and Brown began discussing at that very moment Lippenstein's termination. You can see why. My client denies that, and Brown testifies that when she spoke to Leidy about the position, that Leidy told her. She denies that she took the time off and left early? She denies that as far as December 30th. Maybe she disputes that that was the school that broke the cannon's back, but she doesn't dispute the fact that she came in late and left early. She had worked a long shift before. She has a vestibular recollection. She had permission to do so. The December 30th absence does not appear on the official record. There's nothing in there in the position statement. Well, she denied a day off on December 30th, or before December 30th, in order to attend a concert on December 30th. She asked for a day off, and she was denied. Is that correct? That's not correct. She has denied that, Your Honor, and it's not mentioned as one of the absences in the EEOC position statement. It's not mentioned at all on the official log that they keep as far as absences and tardinesses. She did ask for a day off on December 1st, and there's a dispute as to the reasons that she asked for a day off on December 1st. There were people who went to Leidy that said she really wants off to go to a concert. She said she needed off to work on a group project. That's December 1st, right? Correct. And then she asked for several days off from December 30th to January 2nd. One of the reasons was to attend a concert. She was given off to three of those days. She was granted the way not to work December 31st, January 1st, and January 2nd, but she was told she had to work the 30th. Her position is that because she worked the 30th... Is that right, though? In terms of she worked four days off, she got three days off. I believe that's correct, Your Honor. And on December 30th, she was told she had to work, but she came in late and left early. It's because she had worked an extra long shift the day before, and she had permission on that, and that discharge does not show up on any UPMC record, and it's not listed as one of the three absences. There's three absences from what she's fired from the EMC Commission, and so she was fired for three absences and for a sixth tardiness. So it says that January 4, 2008, Ms. Lipkenstein had been absent three times. November 16th, December 1st, and January 3rd. The position statement doesn't say what the specific absences are. It does not. The position statement cites to the official employee, and that is November 16th, December 1st, and January 3rd. There is no mention about December 30th. The only information we have about December 30th is from Wiley, and Wiley is totally unworthy of belief. A jury could find the body. Let me ask you something. You're specifically saying that there's enough on the recalibrate on this principle of the jury. Absolutely. And if we were to take that approach, we would not then have to decide if mixed motive claims apply. I don't know if that's true or not. Let me ask a clarification on that. Wouldn't it be correct, though, that if we could decide this, that there's enough on pretext, but it would still be up to the district court to decide at that time after the evidence has been presented, whether to charge both on mixed motives and on McDonnell Douglas? Yes. Another way is a direct evidence under Price Waterhouse or McDonnell Douglas. Charge on your vote. On the interference claim. This is a lesson learned, and we request that the circuit says if the negative factor, but if it's used as a core target factor, it doesn't violate the interference provision. Thank you. Thank you.  Mr. Miles. Thank you. Let me just start. I'm going to start. I'm going to start. I'm going to start. Thank you. Thank you.  I'm going to start. I'm going to start. Thank you. Is that what 636 says specifically in the list, then elimination of Title VII? Yes. The language, negative factor, kind of implies mixed motive, doesn't it? Pardon me? The language, negative factor, in the list, the negative factor, wouldn't that kind of imply that we would lose a mixed motive approacher? No, no, no. The statute says because. It says because of engaging in independent activities. It would be cause, as does the ADA. The ADA, which is, you know, goes towards ADHA. So are you saying that this – did you send out a 28-J letter on those? I'm sorry? Did you give us a 28-J letter updating us, updating your briefing on Lewis? I just found this case. This case just came out. It's not a controlling case, but it is contrary to the – Is Lewis, in effect, an attempt to cabin the 2009 case of the Sixth Circuit in Hunter? Yes. It is? Lewis is a – Pardon me? You say it is. Well, I knew what they held in Lewis, and they said they rejected the precedent. They said we were wrong. The Supreme Court's case, they were wrong in two points, two stories. The first one had to do with a sole factor evaluation that they used in ADA cases, and the second had to do with the motivating factor. What's the site to the Lewis case? It's document number 096381, the court of the Fifth and Sixth Circuit. It was decided May 25, 2012. Is it? I don't know what you mean. That's a bank. Well, as I say, it was pretty much after the invention. Yes. We'll have a lot more than one other decision from the Supreme Court. Yes, of course. Gross, did gross come down? I thought gross came down to 400. Is that right? And they declined to apply gross or extend gross to the FMLA in Hunter. And you're saying that now they've taken the opposite tact to get in line with other circuits. Yes, sir. And if I could, sir, please, that we look at the notice doesn't have to be, by the employee, doesn't have to be specific legal form. There are no magic words. Reasonable interpretation. This is not really the first we've used. Now, you know, maybe going to the emergency room by ambulance doesn't always involve a serious health condition. Wouldn't that be a reasonable interpretation? It wouldn't, because if this had been, as in the hypothetical, this had been the employee who said, I'm in the hospital, I'm in the emergency room, I won't be able to work today, then I would say that that would probably be reasonable. That is, that if the employee didn't show up the next few days, that the employer should look into the issue. However, here, it was not the employee who was sick, it was the mother. And there are two things that the notice has to give to the employer, tell the employer what it is. That is, a chronic health condition that resulted in her going to the emergency room or that she had a condition that would incapacitate her for more than three days and would require continued treatment. That's one thing. But the second part of it is that the plaintiff was needed to care for her mother. She called in and the mother was already at the hospital. There's no reason for the employer to infer that therefore the plaintiff had to stay there to take care of her mother. She felt that that would be a natural thing to do, but there's no evidence in this record that the plaintiff was an only child, that there's no other family members there, who else was at the hospital to give nurture, or any of that type of information. It was simply a situation where she said, I can take my mother to the hospital, I won't be at work today. She actually didn't take her. She probably went in an ambulance. Now, the very next day, as John had pointed out, I think it's very important, the plaintiff was at work. So who would infer that she's needed to care for her mother who was in the hospital? But even more importantly, in the email that was sent after the decision was made to discharge the plaintiff, she specifically said, I'm going to have to take care of my mother after she gets out of the hospital. Now, that certainly would suggest that she wasn't needed to care for her mother while her mother was in the hospital. Was there any other evidence that a doctor's opinion or report of the mother for some emotional reason required the presence of the plaintiff at the hospital? That's what's required for FMLA, for the absence of a third to be FMLA qualified. Our point is, even if it was, the employer didn't have reason to know that it was. I want to get to that. It's a question of fact. That is, why should the jury decide whether the information provided, given all the circumstances, the information provided on the 3rd of January was sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition? Because the facts that what was known to the employer there is not in dispute. There's no dispute as to what was said. What Jeff Standish said was, there's no way that a reasonable jury could infer from that that you basically should have known that this was an FMLA event. And I believe the judge is clearly correct. There was too much missing. It was noted on the walks that his mom was sick, and that's what was in the record. But there's a more fundamental point about the January 3 absence. The plaintiff got her time off. She got the leave with the FMLA permits. This was not an interference claim associated with the January 3 absence. What the plaintiff is making is a retaliation claim. She got her day off. So she's saying, I was fired because I took an FMLA leave. So in order for her to make out a case of retaliation, it's not enough of her to show that I talked to this person, this night supervisor, she has to show that the decision-makers knew that she had taken a leave that would qualify as FMLA. Didn't they know by January 10 that the leave would have qualified for FMLA purposes? They had more reason to think by January 10 that it wouldn't than they had to think that it would for this reason. Well, first of all, there's no evidence that Deborah Whiting knew the mother was sick until she got the e-mail of January 8 to which she responded on the night, even if it was a sickness. The e-mail Deborah Whiting got from the assistant was simply that the mother was taken by ambulance. No, Deborah Whiting did not know that. She was on vacation. She got an e-mail that said plaintiff called off. Didn't even say she called off sick. It just said she called off. So what she learned later was that the plaintiff needed leave to take care of her mother after she was hospitalized. That's what the e-mail told her. So that doesn't tell her anything, although that would suggest that that absence on the 3rd was FMLA qualifying. And there's no reason why it would be, unless it was some unusual situation where the mother had to have a presence for emotional support. There's no medical evidence to support that. How about the timing of the U.N.P.O.C.'s decisions? Can you be somehow so far from the timing, the proximity of the fact that there was an improper medical? Well, you can in appropriate situations, but not, and you're also clear on this, not when the evidence, the undisputed evidence shows that the decision was made before any protected activity was engaged in. There's no question that the request for leave on January 1st. Well, their evidence claims that, but it's kind of shaky and contradictory, isn't it? I mean, life is, as I recall, when the Secretary was in the Sopranos trial, she couldn't recall when she learned about it. There was no reference to the reasoning, the staff log was incorrect, and most of all, the U.N.P.O.C. did not mention it in its statement to the EEOC. There's no other truth. No, Your Honor. All right. Go ahead. Tell me quick. That's why we're here. The rest of the parts are here. Here's what Ms. Leiby said. Ms. Leiby was very clear in her testimony that she decided the deployment was not going to work out, and in that job, on the day that she left, arrived late and left early after having asked her off for this time to go to the concert, she said that she planned to have it sometime in late December, but she wasn't sure when it was. She was very hazy on the details, but she knew when it was that caused her to come to that conclusion. Now, the EEOC was, and the fact that she can't remember the date. Exactly. But she knew that it wasn't her decision. And there's never been any inconsistency as to the reason for the termination. Now, if you look at the EEOC position statement, first of all, I think it's important. I think there was some inconsistency in the reasons underlying the decision to fire her. And that not one time, Your Honor, was an inconsistent position taken. What was her position in court that she said? What was her position that she said she fired her? Absences, tardiness, and rescheduling problems. And when they told her on the 10th that she was being fired, what did they say? They said absence and tardiness. And in the position statement, first of all, the charge that was being responded to was a religious harassment charge, primarily. The first five pages of the position statement request all of these incidents that occurred when she worked for Western Psych. That was the gist of her EEOC complaint. On the last page of the document, it mentions her discharge, and it says she was a nightmare to schedule, according to Amy Harris, the administrative assistant. And then it attaches a number of documents, not just the one that Mr. Salky is referring to. They say documentation regarding Ms. Lincoln's neglect, lateness, absences, and scheduling issues is enclosed as Exhibit M. And that included things like Moon House and so forth. But there's never been a contradiction as to why she was let go. I think I just want to point out, Mr. Myers, real quickly that this is a Sixth Circuit decision, and it's a very close decision. My time in both tribes is eight to seven. Seven judges dissented on the question of whether motivated fracture or but-for causation. The testimony she brought prior to holding was to reverse the Sixth Circuit's rule that in the ADA case you had to show that discrimination was the sole cause of harm. Yeah, that was the principal basis upon which they took her on bond. But we're still up, eight to seven. I don't think that this decision needs to turn on that. I just do think it's important to note that that was Sixth Circuit's decision. I think when you look at it, it's clearly limited to the ADA. On the issue of recalling a taken decision, I'd like to mention one other thing, and then I'll sit down. And that was that Mr. Honey was very hazy and foggy that day. Nevertheless, it was very clear from the vice president of resources, who was involved in the decision, that the decision was made on the 7th, and the decision was to discharge the plaintiff on the 8th, and then she called it, and it wasn't done for that reason, and so therefore they had to postpone it. And so the decision clearly predicted that what we would agree would be a protected act as to the request for leave in the email. And so the focus has to be on January 3, which is not an FMLA-protected absence. And even if it were, there's no evidence that the decision-makers knew that it was an FMLA-protected action. And finally, there's no evidence that they even took into consideration the January 3 date. I might note it's not even referred to that date in the position statement as a reason for a discharge or as a final straw. Instead, the position statement says, we have an attendance policy, and she doesn't have enough days off to discharge her under that, but she's a probationary employee, so the decision is made to discharge her anyway, and it refers to the taxes, the documents related to the tolerance, the absence of drugs, and the scheduling difficulties. Thank you. Thank you very much. Our position here on this is that what's why you aren't, that while the absence that she was relying upon to discharge was obscene, while she was protected by the FMLA, she cannot use that as a negative factor. But whether she will now, if she made the decision on the 7th, or possibly even as early as December 30th or 31st, but then decided just to go on vacation and not deal with that difficult problem until she got back, and the call-in mentioning, in effect, a leave of absence the first time was the 8th. Right. Well, she's going to do that as of January 10th, and our position is once she learned, even if she made the decision on January 7th, once she learned that she was relying on an FMLA to protect her leave, she can't use it, and that's what she did on January 10th. She knew that she had to make the decision on the 7th, and somebody asking for a leave of absence on the 8th, that means that on the 8th and the 9th and up until the time of the termination meeting on the 10th, did they have to go back and reconsider it? Yes, they had to reconsider it once they found out that one of the absences that they were using was a protected absence, and that they can't use that. But they used it, because if that's based on the EEOC position statement, there were three absences, and the record that they submitted to support that three absences was on December 17th, December 1st, and January 3rd. If you're going to prove a facial case for an FMLA violation, you've got to put them on notice. And the January 3rd call-in, you would have to have been clairvoyant at the UPMC for them to have gathered that that might be an FMLA request. I don't know that the woman asked you that question, Your Honor. She said that her mother was taken to the hospital by ambulance, and she's in the emergency room. I would submit that that gives rise to an ambiguity in court. That's why I come back to the point that I made earlier. Let's assume there was an ambiguity. Let's just give her every benefit of the doubt. She could have cleared up that ambiguity on the 4th when she was there. She could have cleared up that ambiguity by a call-in on the 5th, the 6th, or the 7th. She didn't know. She didn't know, but she didn't know before she was discharged. The question is, on January 10th, did they use FMLA-protected leave as a reason for discharge? Even though she was a wife, she told her supervisor on the very first day that the two of them were working together after January 3rd. You know, this is not an attorney we're dealing with. We're talking about a psych tech. Before she gave the written notice, that would have been proper. It probably could have been proper, I suggest, Your Honor. But they can't even get on the negative factor. I agree with Your Honor's statement. The negative factor is the same as one negative factor. I would just like to touch on the issue of pretext. This whole issue about December 30th comes up by Lani, but Lani, frankly, is not a juror-confined, and she's not worthy of permitting it. Lani first asked whether or not she made the decision on January 10th. She said, I don't remember. Did you make the decision before December 31st when she went on vacation? She said, I don't remember. It's only after a breakfast request by the defense counsel, not Mr. Myers, but the defense counsel, when she comes back and says, oh, yeah, it was before I went on vacation. A contradiction in her testimony. And then that is contradicted by the fact that the EEOC position statement, it does mention December 30th, and it does mention January 30th, and the vice president of human relations says when she spoke to Lani about the decision, Lani said that all she knows about the decision, she knows that the decision was asked internally because of my work in Costco. That's what the HR person said. So, again, Lani is not worthy of it. She denied receiving that January 8th e-mail. I see here Mr. Myers' message. She didn't receive it because she denied it. She said, I didn't get it. On January 10th, she said, on January 10th, I had no knowledge that Melissa Payne was taking care of her mother completely. So, Lani, I'm not sure if there's issues, material issues of that that need to be resolved. Definitely not. Thank you very much. Thank you.